UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

                V.

JOHAN ANTNEY,

                Defendant.

-------------------------------------------------------X

17 Cr. 229 (RRM)

## SENTENCING MEMORANDUM
## ON BEHALF OF JOHAN ANTNEY

On behalf of our client, Johan Antney, we respectfully submit this memorandum in order to advise Your Honor of several matters that the defense will raise at the time of his sentencing to aid in the determination of the appropriate sentence. On February 14, 2018, Mr. Antney appeared before Your Honor and entered a plea of guilty pursuant to a Plea Agreement with the Government to a lesser-included offense within Count Three of the Indictment, Brandishing a Firearm in Furtherance of a Crime of Violence (Hobbs Act Robbery), in violation of 18 U.S.C. § 924 (c)(1)(A)(ii). Mr. Antney's sentencing is scheduled to take place before Your Honor at 11:00 A.M. on April 3, 2019. At that hearing, the defense will respectfully ask the Court to impose a non-Guidelines sentence with a term of imprisonment of ninety-six (96) months. The following discussion will demonstrate that a period of incarceration of ninety-six months would be sufficient, but not greater than necessary, to fulfill the goals of sentencing.

# DETERMINING THE REASONABLE SENTENCE

*The Legal Standard: The Parsimony Clause*

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence ***sufficient, but not greater than necessary***" to achieve the purposes and goals of sentencing (emphasis supplied). This duty, known as the "parsimony clause," governs every federal sentencing "except as otherwise specifically provided."18 U.S.C. § 3551(a). Notably, it is the command of the parsimony clause which establishes the court's "overarching duty" in determining a reasonable sentence. *Pepper v. United States,* 131 S. Ct. 1229, 1243 (2011).

Among the factors to be considered in arriving at a just sentence are the history and characteristics of the defendant, and the circumstances of his involvement in the offense. The sentence should also reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

As the Supreme Court reaffirmed in *Pepper*, in light of the long-accepted principle that "the punishment should fit the offender and not merely the crime," the "sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that

2

the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007). The Supreme Court again reiterated that principle in *Nelson v. United States*, 555 U.S. 350, 352 (2009) by emphasizing that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed reasonable*" (emphasis in original). Rather, the sentencing judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." Id. at 597. The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

***Calculating the U. S. Sentencing Guidelines sentencing range:***

Although the Court is mandated to begin each sentencing hearing by determining the correct Guidelines calculations applicable to the case, the Court must then conduct its own independent review of the sentencing factors. Here, at the time of the plea entry, the parties stipulated that the effective total Guidelines range for Johan Antney would include a term of imprisonment of 125-135 months. *See Plea Agreement, p. 3.* This computation is based upon the underlying Hobbs Act Robbery Conspiracy set forth in Counts One and Two of the Indictment:

- Base Offense Level pursuant to USSG §2B3.1(a):     20
- Victim's Serious Bodily Injury USSG §2B3.1(b)(3)(B):   + 4
- Global Plea Downward Adjustment (USSG §5K2.0):   - 1
- Acceptance of Responsibility (USSG §3E1.1 (a)):     - 2
- Acceptance of Responsibility (USSG §3E1.1(b)):     - 1

--------------------------------------------------------------------------

- Total Adjusted Offense Level:     20

As noted, the Pre-Sentence Report ("PSR") recognizes that Mr. Antney is entitled to a one-level reduction for facilitating an expeditious disposition of this matter by entering into a Global Plea settlement before a prescribed date. (*See PSR*, Part F: Factors that May Warrant a Sentence Outside of the Advisory Guidelines Range, p. 23). Accordingly, given the Total Adjusted Offense Level of 20, the applicable Guidelines sentencing range for the underlying Hobbs Act Robbery is 41 – 51 months.

The sentence imposed for the Hobbs Act Robbery must be followed by a mandatory consecutive term of imprisonment of 84 months under Count Three, pursuant to USSG §2K2.4(b). Consequently, based upon a Total Offense Level of 20 and a Criminal History Category III, the PSR confirms that the correct sentencing range pursuant to the U.S. Sentencing Guidelines is a term of imprisonment of 125-135 months,.

Finally, although these agreed-upon calculations reflect the parties' understanding of the Guidelines provisions, they are nonetheless not mandatory, and do not preclude a non-Guidelines sentence. Indeed, for the reasons discussed below, a sentence of ninety-six (96) months' imprisonment would satisfy the statutory mandatory minimum term, and would be sufficient but not greater than necessary to achieve the goals of sentencing.

***Sentencing Factors to Consider Pursuant to 18 USC § 3553(a):***

As detailed below, there are compelling reasons why the sentencing factors set forth in 18 USC § 3553(a) favor a sentence of ninety-six (96) months. Johan Antney's personal history reveals that he is a young man who was thrust at birth into a highly insecure, threatening world. Scorned by an abusive father and

endangered by a fearful mother who could not protect him, young Johan struggled to find a safe place in the world.  At school, he endured daunting difficulties which authorities were able to diagnose, but not to treat effectively:  Through testing, he was labeled 'Learning Disabled' and 'Emotionally Disturbed,' but the deficits in his education were so profound that he was never able to overcome his failures in school.   In spite of all the adversity he faced, however, Johan blossomed on those rare occasions when he had rewarding bonding experiences, particularly with other males. Now he recognizes that his desire to fit in with male friends made him vulnerable to recruitment into criminal activity, and he expresses considerable remorse for his involvement in criminal conduct.

The following discussion of Johan's personal history and characteristics is based upon research conducted by Carmeta Albarus, Licensed Clinical Social Worker and Psychotherapist; evaluations conducted by schools, medical facilities and the New York City Department of Special Education; and extensive attorney interviews with the defendant and family members.

**Johan Antney's Personal History and Characteristics**

*a)  Childhood and Family Background:*

Johan Antney, age 28, was born to the marital union of Joseph and Keisha Antney in Queens, New York in 1990.  From the time of his birth, his parents' marriage was marred by conflict and strife.  His mother had met his father when she was a 14-year-old teenager, seeking refuge from her troubled home-life. She was accustomed to seeing her parents fight constantly, bitterly accusing one another of betrayal.  Keisha found an escape in the companionship of 19-year-old

Joseph Antney, who seemed charming and supportive. Keisha's situation at home grew progressively more desperate when her father left her mother for another woman, shortly after her mother had given birth to a baby girl, Shequana. Keisha saw her mother descend into a crippling depression, which grew horrifically worse when baby Shequana died. Watching as her mother began to abuse drugs and alcohol frightened Keisha. She recalls that her mother was often too drunk to care for herself or her children. There were times when her mother made an effort to attend substance abuse treatment programs, but Keisha could not stand to be around her anymore, and she sensed that her mother preferred to avoid her, too.

Increasingly, Keisha longed to be rescued, so when Joseph Antney brought her into his family's large household, she felt happy and safe for awhile. For a time she lived with Joseph's sister, and then moved in with his parents and other extended family members. At age 18, Keisha gave birth to their first son, Joseph Antney, Jr. The feeling of belonging to a family appealed to her, and she decided to marry Joseph Sr. Two years later, their son Johan was born.

Although the couple had seemed happy at the birth of their first son, much had changed in the intervening two years before Johan was born. Keisha discovered that, while she was pregnant, Joseph was pursuing other women. He would lose his temper at her and get rough physically. Increasingly, the relationship between Keisha and Joseph grew poisonous, infected by abuse, neglect and infidelity.

Thus Johan was born into an atmosphere fraught with resentment and acrimony. Johan's early memories are of the domestic violence he witnessed. He recalls feeling depressed from an early age due to the cycle of abuse at home. He saw his mother getting beaten up by his father, and remembers his father throwing things out the window during fits of rage. Johan's instinct was to run to his room

whenever his parents started fighting, but he would still hear the blows and arguments.  At times Johan was also abused.  "My dad was just real abusive," Jonah said.  "I can remember him beating me for crying when I was left with him."

Although his mother day-dreamed about leaving his father's family, she lacked the confidence and the resources to do so.  She knew that her in-laws were aware that Joseph was abusing her physically, but they did nothing to protect her.  Instead, they treated her like a servant, expecting her to clean and do other household chores.  Keisha's grandmother warned her not to consider leaving the boys' father, because that would only leave her destitute.  As a consequence of her inability to leave, Keisha stayed and suffered the continuing indignity of neglect and mistreatment by a womanizing husband.

As Johan grew older, he recognized that his mother had no choice but to stomach the abuse.  He noticed that his paternal grandmother and other relatives "looked the other way" rather than intervene to stop his father's abusive behavior.  Johan observed that his mother was treated like an unpaid servant while she lived with his father's family.  His mother had to clean all rooms of the in-laws' large home, and tidy up each time one of her in-laws created a mess. His aunts often told his mother to get out of the house if she did not like how they treated her.

There were times when his mother left, but after a couple of days, financial hardship would force her to return to his father.  One outstanding memory is of his mother telling him and his younger brother to pack their bags because they were leaving. This was after his father, in a fit of fury, smashed his mother's fax machine and threw it out the window. That incident occurred when Johan was about 6 years old.  He was horrified when his mother took him and tried to escape by driving away in his father's car.  He recalls his father chasing them down, and

feeling like he was "going to die" in a car crash.  He and his mother stayed with an aunt for a few days, and then they went back to live with his father.

From early childhood, Johan became acutely aware that his older brother Joseph Jr. (Joey) was the apple of their father's eye, and always yearned to be like him.  His mother Keisha confirms that Johan's father never cared for Johan or his younger brother, Jaison, and acknowledges that their first child, Joey, was the favorite son. While Joey was often praised, Johan was made to feel that his father did not expect much from him. She confirms that Johan received far less attention than Joey, as their father "lavished money and attention on Joey" but neglected Johan's needs.  While Joseph Sr.  would regularly spoil Joey with devoted attention and lavish presents, he would consistently ignore Johan and Jaison. Indeed, Keisha was increasingly worried by young Johan's reaction to his father's neglect.  Johan was displaying worrisome problems in school, with a record of learning difficulties and a history of emotional disturbance.

It was not until 2005 that Keisha's involvement with another man, Edwin Duran, finally enabled her to leave Joseph Antney Sr., and to demand a divorce. The fact that she was pregnant with another son, Anthony Duran, now age 11, undoubtedly helped her break free after she had felt trapped for so long. Nevertheless, Keisha observed that this disruption in the family unit adversely affected her son Johan's functioning.   In 2007, a school social worker advised her that Johan was still reacting negatively to the divorce of his parents two years earlier.   Keisha told the school social worker that the divorce remained an unresolved issue for Johan, and that he wanted to see his parents back together. Despite his father's abusiveness and neglect, Johan grieved for his father's absence from the home, and experienced his parents' divorce as a loss.

Although he was deeply disappointed by his father's rebuffs, Johan admired his father's "style and showmanship." He wanted to imitate him, even though his father's lifestyle had led to short stints in jail for drug-related offenses. In hopes of building a closer connection, Johan would visit a phone store where his father worked. But those visits further complicated Johan's feelings, since his father appeared incapable of treating him like a valued son. It is noteworthy that Joseph Sr. declined to be interviewed for the purposes of this sentencing submission, stating over the phone that he was busy and not interested in talking about Johan. This refusal to speak on his son's behalf seems to confirm reports that Joseph was a negligent father, particularly toward Johan.

### b) *Johan Antney's Learning and Emotional Disabilities:*

When Johan entered school, his mother told school authorities that Johan had not reached basic developmental milestones at a normal rate. Particularly, she cited delays in his speech and language development. Johan's special education records corroborate a history of learning disability and emotional disturbance. He was showing learning and emotional difficulties shortly after his enrollment in the New York City public school system. Teachers viewed him as well-mannered, but, by the 2nd grade, his learning difficulties and acting-out episodes triggered formal concern. In the 2nd grade he was referred to St. John's University for the first in a series of psychological tests. Accompanying this submission is defendant's Exhibit A, an in-depth report of the social / psychological history of Johan Antney prepared by Carmeta Albarus, LCSW-R. It includes a thorough report and discussion of the results of psychological tests conducted during his days in the New York educational system. A summary of those tests follows:

9

- The St. John's psychological evaluation, conducted in December 1997 and recorded in 1998, found Johan's full-scale IQ to be 113; there was a discrepancy between his nonverbal IQ (132) and his verbal IQ (94). This meant that his ability for non-verbal reasoning, such as assembling puzzles and arranging pictures in sequential order, was more advanced than skills requiring verbal comprehension and expression. The significant disparity between verbal and nonverbal (Performance) IQ scores is found primarily in individuals with 'acting out' tendencies who are likely to perform poorly academically or have poor reading ability and may be described as 'doers, not thinkers.'
- The use of behavioral testing, visual motor testing (Bender Gestalt) and projective testing also helped to assess Johan's needs in 1998. The BASC-Parent scale[1] reflected "clinically significant problems" indicative of maladjustment related to difficulties in conduct, attention, and adaptability. Difficulty in those areas was also cited as clinically significant when the BASC-Teacher scale was used. Formal therapy might be required to treat the significant at-risk behavior that was characterized by anxiety, depression, and atypicality.
- The St. John's report noted coping problems which lead to depression. Projective testing noted an inability to deal with "natural demands of the social world", e.g. his difficult interactions with teacher and classmates.
- Individual therapy was recommended to address behavioral issues and depression, and to help improve coping and adaptive skills.

---

[1] BASC is the acronym for Behavior Assessment System for Children

> Neuropsychological testing was recommended due to "severe graphomotor impairments" as demonstrated in Johan's drawings and on the Bender Gestalt test. In addition, it was noted that remediation efforts should include individual attention.

Despite these recommendations, Johan did not receive individual therapy or remediation. Two years passed without any noticeable improvement. At that point, Johan's mother, Keisha, asked authorities at the NYC Board of Education to pursue further evaluations in May of 2000. Johan was 9 years old and in the 4th grade at Holy Trinity School at the time. The evaluations approved by the NYC Board of Education included testing at the Schneider Children's Hospital, Division of Neurology, on July 14, 2000.

- Schneider Hospital evaluators/screeners noted that Johan had a history of Attention Deficit Hyperactivity Disorder (ADHD). A history of head injury was also noted. (the letters MVA was written beside head injury, which is likely an abbreviation for motor vehicle accident.) Other issues noted included emotional immaturity, inattentiveness/distractibility in classroom and at home, deteriorating grades, difficulty completing classwork, impulsiveness, and argumentativeness.
- The hospital referred Johan's parents to the local chapter of CHADD (Children & Adults with ADHD) to seek support and education related to Johan's needs. Other recommendations included behavioral intervention in the classroom and medication treatment, which was not received at that time.
- The 2000 testing indicated that Johan's intellectual functioning was in the low average range. This indicated a decline from his IQ testing in 1998, when he was functioning in the average range. He showed delays in reading

and writing skills including reading comprehension. Though he was in the 4th grade, his reading comprehension was at the 1st grade level, his listening comprehension was at the 2nd grade level as were his decoding skills, and his writing was at the beginning kindergarten level. He was stronger in math such as computing and problems solving, but, even in those areas, he was performing at a 2nd to 3rd grade level.

As a result of this evaluation in 2000, Johan was classified Learning Disabled and in need of special education services.

- His individualized Education Program (IEP) for the 2000-2001 school year corroborates the learning disability classification.
- It is noteworthy that Johan's IEP in 2000 failed to include counseling and social-emotional management services, even though he was exhibiting emotional/behavioral difficulties and had been diagnosed with ADHD.

Once again, a diagnosis/classification of Learning Disabled was reaffirmed in Johan's 2002-2003 IEP. At the time, consideration was given to putting him in a special class where he would have received full-time specialized instruction, but special education officials rejected that consideration.

- The 2002-2003 IEP described Johan as a "slow learner." He needed extra time to organize his thoughts. Furthermore, the IEP noted the need for large charts, more visuals, manipulatives, and extra time to complete assignments, class work and testing, and preferential seating was required to minimize distractions.

- Of his social-emotional functioning, the 2002-2003 IEP indicated that Johan's demeanor was generally that of a "respectful individual" who behaved appropriately towards peers and school officials. This observation perhaps influenced a deferral of school-based services to help Johan manage social-emotional needs.
- Special education administrators wrote "None" on the IEP, indicating the absence of any resource or services for social/management needs. Johan's management needs were thus denied even though emotional/behavioral difficulties contributed to referrals for his evaluations since the 2nd grade. The 2002-2003 IEP cited Johan's overall good behavior, but also noted that he was agitated for no apparent reason at times, which then led to arguments with peers and, sometimes, to a difficult relationship with school officials.

At 13-14 years old, Johan's functioning again raised the question of whether his special education program was adequate for his needs. At the time he was in 7th grade and receiving instruction in a Collaborative Teaching Program (CTT). A CTT program means that he was in a general education classroom that had both a general education teacher and a special education teacher. One alternative considered was to take him out of general education and put him in a special class with a smaller student to teacher ratio, which would be more structured with only a special education teacher giving instruction.

- In January 2004, at age 13, Johan underwent psycho-educational re-evaluation due to his poor performance and the possibility of placement in an alternative program to the CTT. The psycho-education report reconfirmed his history of learning and emotional/behavioral deficits from

13

prior evaluations. The accompanying recommendations included consideration for a "more structured and supervised educational setting so that social and emotional needs as well as academic needs can be adequately met."

- Johan's IEP dated June 27, 2005, again noted "significant deficits" in his social-emotional functioning as well as his learning delays. His disability classification was Emotional Disturbance and, also noted, was his taking of medication for ADHD.

From 2005 to 2007, truancy complicated Johan's performance in school and contributed to the impression that he was unmotivated.

- The issue of Johan's special education needs continued into 2007, when he withdrew from school. A January 2007 psychological report described "an affable youngster" whose emotional issues were affecting his education. At the time, Johan's intellectual functioning was assessed to be in the low average to average range. Johan showed some insight into his difficulties, according to the 2007 psychological report. However, impulsivity, questionable judgment and motivation in school were also noted.

Compounding the emotional turmoil that he experienced during his school days, Johan recently revealed that he was sexually molested by an older woman who was a friend of one of his aunts. He recalled that he was attending Russell Sage Elementary at the time, and would stay with his aunt after school. Living at the house was a friend of his aunt by the name of Tarara. He recalled that this woman, old enough to be his mother, would grab his "private parts," spit on him, then fondle him to the point that he would ejaculate. This happened on more than

one occasion, and made him feel distressed and uncomfortable. He recalls telling his mother about it; she stopped him from going there after school, and it was never mentioned again. Nonetheless, the memories of this woman's conduct have continued to bother him.

In 2007, the year Johan dropped out of school, his mother Keisha told a school social worker that college and a career were unrealistic goals for Johan. Keisha suggested to the school social worker that Johan should not be encouraged to have educational or career goals and that, instead, he should work with his hands. She informed the school social worker that Johan was good at fixing furniture and electronics. Her position contrasted with Johan's, who told the school psychologist that his goal was to attend college and pursue a career in aeronautical engineering. According to the psychological report, Johan's older brother was already attending college in 2007. The psychological report did not examine the stressful relationship Johan had with his older brother. Regrettably, it appears that Johan's perception is accurate: Unlike his older brother, his dreams or aspirations never received the support of family members.

### c) *Johan Antney's Attempts to Fit In With Male Peers*

When Johan was 15 – 16 years old, his mother sent him to live with his paternal aunt Debra in Atlanta, Georgia. Johan's older brother, Joey, was already attending college in Atlanta, and Johan was eager to grow closer to Joey, and to win Joey's approval.

In Atlanta, Johan tried his best to ingratiate himself with his Aunt Debra and his cousins. He knew Debra as the mother of the late Rahleek Malphurs, whose death as a child had traumatized Johan when he was just 9 years old. Debra

15

is also the mother of a popular, successful rapper known as Waka Flocka. Johan wanted to prove that he could fit in as part of his aunt's family, so he tried to show his familiarity with the music industry, and his skill at performing tasks.

At age 16, Johan started going on tour with the rapper Gucci Mane, working as a "wardrobe assistant and stylist." Johan earned $500.00 a week when he accompanied Gucci Mane on tours. Gucci Mane, whose real name is Radric Delante Davis, was known for having hits on the Billboard music charts. But Gucci Mane also has a history of brushes with law enforcement. Eager to be included in that world, Johan was thrilled to be on tour with Gucci Mane.

The amount of $500 per week that Johan received from Gucci Mane did not go very far; he had to spend it all on basic necessities. However, the recognition he received while touring with Gucci Mane was more important to him than the money. He yearned for that sense of importance even as he realized his role was marginal, and his income was 'peanuts' compared to that of his relatives. He took pride in mentioning to everyone that rapper Waka Flocka is his cousin. He also told friends that his Aunt Debra is worth millions of dollars due to her successful investments in the music industry.

By being around successful rappers like Gucci Mane and Waka Flocka, Johan felt his father would have a higher opinion of him. He had heard that his father pursued contact with many rap artists, and would show up at his cousin's tours occasionally. Johan felt good whenever he saw his father on tour, even if their interactions were fleeting.

Johan reported that his older brother, Joey, was also forging a career in the music industry. Reportedly, Joey goes by the rap moniker, F1JO, and has produced a successful record called "No Beer." Johan wanted to attain the kind of

recognition that his brother enjoyed; it was something that they could proudly share.

Johan returned to New York from tours with Gucci Mane feeling like a celebrity. Back at home, Johan tried to sustain the sense of importance he felt when he was on tour with Gucci Mane. He recalls walking around with a Gucci Mane chain around his neck. "I was like a star and guys started seeking me out," Johan said. Now Johan realizes that he appeared open and vulnerable to groups with criminal intentions, because they could see his need for inclusion as something they could exploit.

Upon reflection, Johan admits that he was just being a follower. He wanted someone to follow, particularly as a way to impress his family members. Today he expresses regret that he began following the wrong crowd and getting into trouble with the law. Joining into group activity led him to where he is now. His pent-up need to make money quickly, taken together with his desire to be accepted by other young males, may help explain Johan's involvement in the criminal conduct in this case, but does not, of course, excuse it. Johan has acknowledged his regrets to counsel, expressing deep remorse for his behavior. He has promised his mother that he will not repeat his involvement in criminal conduct.

Further, when Johan was initially incarcerated in this matter, he experienced anxiety at the prospect of being deprived of Percocet, which he had grown accustomed to consuming on a daily basis. Now, after recognizing that he had developed an addiction to marijuana and Percocet, he has decided that the best use of his time in prison will be to address and conquer his pattern of substance abuse, as well as to advance his education.

In conversations with Johan, it is evident that he has reflected upon his own bad behavior, and regrets its adverse impact upon others, especially his mother.

17

Thus, it is respectfully submitted that, notwithstanding his past criminal activity with other young men, Johan's insights will provide him with a sound prospect for leading a law-abiding and productive life in the future.

## CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court sentence Johan Antney to a term of imprisonment of ninety-six (96) months. Mr. Antney has developed insight into why he was vulnerable to recruitment into the criminal activity of male friends. He is remorseful for his participation in the conduct that led to this conviction. Johan is planning to use his prison time productively by earning a high school diploma through the G.E.D. program, and by participating in a serious drug-treatment program. To avoid the risk of reverting to his daily consumption of the addictive opioid Percocet, he respectfully asks Your Honor to recommend that he be placed in the Bureau of Prisons' 500-hour RDAP Program, or a program of comparable value. A serious drug treatment program would help Mr. Antney develop the skills needed to resist succumbing to the opioid abuse that is presently plaguing this country.

A sentence of ninety-six months, followed by a term of Supervised Release, will give Your Honor ample opportunity to monitor Mr. Antney's post-incarceration progress, and to take corrective action, if necessary. Therefore, on behalf of Mr. Antney, we respectfully submit that a term of incarceration of 96 months, together with a recommendation that he participate in the Bureau of Prison's 500-Hour RDAP program, would be a just, fair and sufficient sentence, but not greater than necessary to fulfill the purposes and goals thereof.

Thank you very much for your consideration of this submission.

Dated: New York, New York
       March 5, 2019                       Respectfully submitted,

*Peter E. Quijano*

Peter Enrique Quijano, Esq.
Anna N. Sideris. Esq.

cc.:    A.U.S.A. Michael Keilty
        U.S.P.O. Shayna Bryant